THE STATE, EX REL. SWANDER, *v.* INDUSTRIAL COMMISSION OF OHIO; ARCO, INC.

(No. 82AP-737—Decided December 15, 1983.)

*Gallon, Kalniz & Iorio Co., L.P.A., Ms. Dorothy B. McCrory* and *Mr. Steven M. Spitler,* for relator Delmar A. Swander.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, and *Mr. Merrill Henkin,* for respondent Industrial Commission.

*Messrs. Spengler, Nathanson, Heyman, McCarthy & Durfee* and *Mr. James M. Sciarini,* for respondent Arco, Inc.

STRAUSBAUGH, J. This is an original action in mandamus requesting that this court find that respondent, the Industrial Commission of Ohio, abused its discretion, and order the Industrial Commission to vacate its orders denying relator's motion for an award for permanent partial disability under R.C. 4123.57(C). In addition, relator requests that this court find that he has a permanent partial disability for the uncorrected loss of vision suffered as a result of an injury incurred in the

course of his employment with respondent Arco, Inc., on May 9, 1979, when a line on an air compressor blew up and struck him in the face fracturing his left cheek bone, lacerating the cornea of his left eye, and lacerating his face above and below the left eye.

The record indicates that, on November 5, 1979, relator filed a motion with the Ohio Bureau of Workers' Compensation and the Industrial Commission of Ohio requesting:

"That the permanent partial disability be determined for the uncorrected loss of vision that I have suffered as a result of this injury pursuant to Section 4123.57(C)."

On June 8, 1981, a district hearing officer for the Industrial Commission denied relator's motion, stating in part:

"Claim previously allowed for: fracture left cheek bone lacerated corneal [sic] left eye laceration above and below left eye.

"It is the finding of the Hearing Officer to disallow the claimant's motion. Medical proof does not warrant an Ohio Revised Code 4123.57(C) award.

"Decision based on medical reports submitted by Dr.'s Perkins and Weiden [sic]."

Thereafter, on July 6, 1981, relator filed a notice of appeal from the decision of the district hearing officer. On August 26, 1981, the Toledo Regional Board of Review issued an order based on the evidence in the file and/or evidence adduced at the hearing that the district hearing officer's order was "affirmed in all respects."

On April 19, 1982, the Industrial Commission denied relator's appeal from the decision of the Toledo Regional Board of Review:

"It is the finding and order of the Hearing Officers that the claimant's appeal filed 11/24/81 be denied, and the order of the Toledo Regional Board dated 8/26/81 be affirmed for the reason that it is supported by proof of record and is not contrary to law."

It is from this order that relator files this action in mandamus.

The record further indicates that, accompanying relator's initial motion requesting an additional award of permanent partial disability, relator submitted a physician's fee bill from Dr. Clark D. Weidaw dated June 4, 1979 describing relator's present condition that his visual acuity in his left eye was "Vcc OS 20/200 resulting from ocular injury." He further stated in response to this question:

"3. Will any additional treatment or operative procedure improve claimant's condition? Possibly.

"If so, describe: If vision does not improve over 6 months, corneal transplantation may be required."

On August 27, 1980, relator was examined by Gerald A. Perkins, D.O., who submitted the following report:

"This patient relates a history of having an accident where he had a corneal laceration of the left eye, a blow out fracture of the left infraorbital rim of the left eye and periorbital lacerations of the left eye and this was repaired at St. Luke's hospital by Dr. Diller and Dr. Weidaw.

"Since this accident which occured [sic] on 5/9/79, patient has had some decrease in his visual acuity in his left eye and he claims this.

"Mr. Swander was seen in our office on 8/27/80, at this time his ophthalmological findings were as follows. His best visual acuity with correction was 20/20 in the right eye and 20/70 in the left eye and this could be pinholed to 20/50 in his left eye. His refractive error was $-6.00 \ +1.00 \ \times 27$ in the right eye and $-5.75 \ +1.00 \ \times 33$ in the left eye.

"The external examination revealed the extraocular muscles to have full versions. Muscle balance was orthophoric. The slit lamp examination revealed pupils which were central and equal. There was some stromal scarring of the left eye at the inferior pupillary margin and also cor-

neal scar starting approximately from 9:00 o'clock to 11:30 but nasal to the pupillary margin. The funduscopic examination revealed a 1-2/10 cupping, spontaneous venous pulses were noted, good macular reflexes and vessels and periphery were within normal limits. Visual fields taken revealed a normal visual field pattern with no gross deformities noted.

"It is my impression that this gentleman received a good surgical response to his initial injury and with the visual acuity that he has, he is able to perform his duties quite satisfactorily.

"I do not have any record of what his visual acuity was prior to his accident but with the high degree of myopia that he has, it is not likely that it was much better than it is at the present time.

"My diagnosis at this time was myopia with astigmatism, corneal scar of the left cornea secondary to trauma. If I can be of any further assistance, please do not hesitate to advise.

"*ADDENDUM:* May 22, 1981 Per telephone conversation with Dr. Perkins this date, he indicated to me that this claimant suffered, as a result of this injury, a 20% impairment."

On September 11, 1981, Paul J. France, O.D., submitted the following letter:

"Patient Delmer [*sic*] Swander was last examined in our office 11-5-77. This involved a vision analysis, examination, and new RX. At that time his corrected vision was 20/20 OD-20/20/OS — and 20/20 OU.

"It may come as a surprise to both of you and to Delmer [*sic*], but I have no uncorrected acuity readings for him since 1956. At that time his uncorrected vision was 20/70 OD, OS, and OU.

"Down through the years as he progressed and became more and more nearsighted, it is of no value to know how poorly a patient like Mr. Swander sees, but rather, how well we can improve his vision.

"The largest letter we have to test him with would be 20/400. In my opinion his unaided acuity would be less than this — approximately 20/600."

On September 25, 1981, Dr. Robert J. Huss, M.D., examined relator and reported that the uncorrected distant vision of the left eye was 10/400; near vision was 20/70 with a central visual acuity efficiency of 0%. Corrected vision of the left eye was 20/80 minus, distant sphere was −6.00 V.A.; near was no V.A., and central visual acuity efficiency was 60%. Dr. Huss' report reads in part as follows:

"EXTERNAL EXAMINATION:
"* * *

"Left Eye white with normal pupillary response, obvious corneal pacification, slight anophthalmos as intraorbital anesthesia in the distribution of the intraorbital nerve on the left.

"FUNDUS EXAMINATION:
"* * *

"Left Eye discs and all other vessels are normal & pigment epithelium is intact.

"SLIT LAMP EXAMINATION:
"* * *

"Left Eye corneal pacification with six to eight small particles that could be glass — it appears that there has been a previous lineal laceration slightly above the visual axis and horizontal approximately from the 8:00 o'clock position over to the 10:00 o'clock position. There was some thinning of the stromal scarring. There was no thinning of the cornea. The lense [*sic*] was clear and the iris was normal.

"* * *

"DISCUSSION AND OPINION:
* * *

"Patient has decreased visual acuity in the left eye due to a previous corneal laceration. The vision of the patient is consistent with the amount of scarring that is present. There has been no damage to the lense [*sic*].

"INDUSTRIAL VISUAL EFFICIENCY: (A.M.A. SCHEDULE)

"Left Eye uncorrected 0%
"Corrected 60%
"BINOCULAR: * * *
"Binocular Visual Efficiency 89.6% corrected vision
"Is claimant able to work with his present corrected vision? Yes"

Relator argues that the language contained in R.C. 4123.57(C) is ambiguous and contradictory and is unclear as to what is to be utilized as the basis for determining the percentage of lost vision. Relator contends that a reasonable and proper construction to be given to the section is that the percentage of vision lost as a direct result of the injury be measured from the uncorrected vision at and prior to the injury and that, where, for ordinary and practical purposes, the injured employee is unable to see and has lost what useful vision he possessed prior to the injury, he has sustained a total loss of sight as contemplated within the meaning of the statute.

We find that there is sufficient evidence for the Industrial Commission to deny compensation for total loss of vision. With respect to partial loss of vision under R.C. 4123.57(C), we find that the twenty-five percent loss of uncorrected vision refers to, and is based upon, uncorrected vision before and after the injury. We find that the wording of the statute is clear and unambiguous. However, even if there were an ambiguity in said section, the stated result is necessary under R.C. 4123.95, which section requires that R.C. 4123.01 to 4123.95, inclusive, shall be liberally construed in favor of employees and the dependents of deceased employees.

This court, therefore, issues a writ of mandamus ordering the Industrial Commission to determine whether relator's loss is compensable as a permanent partial loss and, if so, to what extent.

*Writ of mandamus issued.*

WHITESIDE, P.J., and MCCORMAC, J., concur.