THE STATE, EX REL. KROGER COMPANY, APPELLANT, *v.* STOVER ET AL., APPELLEES.

[Cite as State, ex rel. Kroger Co., *v.* Stover (1987), 31 Ohio St. 3d 229:]

(No. 86-1357— Decided July 15, 1987.)

*Porter, Wright, Morris & Arthur, Darrell R. Shepard* and *Charles J. Kurtz III,* for appellant.

*Ward, Kaps, Bainbridge, Maurer, Bloomfield & Melvin* and *William J. Melvin,* for appellee John W. Stover.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Jeffery W. Clark,* for appellees Administrator, Bureau of Workers' Compensation, and Industrial Commission of Ohio.

*Marshall & Melhorn, Terrance L. Ryan* and *Jennifer J. Dawson,* urging reversal for *amicus curiae,* Acklin Stamping Division.

HERBERT R. BROWN, J. The primary issues presented are (1) whether the trial court erred in dismissing appellant's appeal brought pursuant to R.C. 4123.519 and (2) whether the trial court erred in denying relator-

appellant's application for a writ of mandamus. We hold in the negative as to both issues and, accordingly, affirm the judgment of the court of appeals.

## I

R.C. 4123.519 provides in pertinent part: "[t]he claimant or the employer may appeal a decision of the industrial commission * * * in any injury or occupational disease case, *other than a decision as to the extent of disability,* to the court of common pleas * * *." (Emphasis added.) Kroger submits that its appeal pursuant to 4123.519 was proper since the commission's award under R.C. 4123.57(C)[2] for loss of vision constituted a new diagnosis or condition not recognized as a previously allowed injury and, therefore, was an order "other than a decision as to the extent of disability." Kroger primarily relies on our holding in *Zavatsky* v. *Stringer* (1978), 56 Ohio St. 2d 386, 10 O.O. 3d 503, 384 N.E. 2d 693.

In *Zavatsky,* this court found that the claimant could appeal the commission's order under R.C. 4123.519 to the extent that the commission had determined that claimant's lower back and leg condition was not the result of or related to the allowed injury, laceration and abrasion to the left elbow. Injuries to different parts of the body were involved. Thus, *Zavatsky* is distinguishable and does not support Kroger's contention. Though holding that allowance of a claimant's right to participate for injury to one specific part of the body did not preclude appeal on another specific part of the body, we also held at paragraph two of the syllabus:

"A determination of 'extent of disability' under R.C. 4123.519 presupposes that claimant has been allowed the 'right to participate' in the Workers' Compensation Fund for injury to a specific part or parts of the body involving the loss or impairment of bodily functions. *The decision of the Industrial Commission as to 'extent of disability' constitutes a determination of the basis for the computation of the compensation or benefits payable under the provisions of the workers' compensation law for those losses or impairments of bodily functions allowed as compensable injuries.*" (Emphasis added.)

Our subsequent decision in *State, ex rel. Bosch,* v. *Indus. Comm.* (1982), 1 Ohio St. 3d 94, 1 OBR 130, 438 N.E. 2d 415, speaks more directly to the argument urged by Kroger.

The claimant in *Bosch* sustained an injury to his spinal cord which was deemed compensable as a permanent and total disability. He then filed for additional benefits pursuant to R.C. 4123.57(C) due to the resulting loss of the use of both legs. This court determined that an appeal pursuant to R.C. 4123.519 did not lie "[s]ince the same compensable injury would be the basis for the additional award, * * * and since his right to participate

---

[2] Effective August 22, 1986, this subsection was renumbered R.C. 4123.57(B) and was amended as to the compensation payable.

in the Workers' Compensation Fund for that specific injury ha[d] been determined, an additional award would be a determination as to the extent of * * * [his] disability." *Id.* at 99-100, 1 OBR at 134, 438 N.E. 2d at 419.

We held: "Once a claimant's right to participate in the Workers' Compensation Fund for an injury to a specific part of the body has been determined, any further determination of the Industrial Commission pertaining to the computation of compensation payable under the workers' compensation law for that specific injury is as to 'extent of disability,' and is not appealable pursuant to R.C. 4123.519. (*Zavatsky* v. *Stringer,* 56 Ohio St. 2d 386 [10 O.O. 3d 503], followed; *State, ex rel. Foley,* v. *Greyhound Lines,* 16 Ohio St. 2d 6 [45 O.O. 2d 223], overruled.)" *Id.* at syllabus.

In the case *sub judice,* corneal burns and loss of vision are not separate injuries; rather, loss of vision is a condition flowing from the initial injury which has been allowed. The commission considered the degree of vision loss, not a new source of the loss.

Accordingly, we hold that an order of the Industrial Commission pursuant to R.C. 4123.57(C), granting or denying benefits for loss of vision resulting from an injury previously allowed, is a decision as to extent of disability and not subject to appeal pursuant to R.C. 4123.519.[3] The court of appeals properly found no error in the dismissal by the trial court of appellant's appeal.

We turn now to the mandamus issues raised by relator, Kroger.

## II

Where appeal is unavailable because the commission's order constitutes a finding as to the extent of disability, mandamus is proper to test the commission's exercise of its discretion. See *State, ex rel. General Motors Corp.,* v. *Indus. Comm.* (1975), 42 Ohio St. 2d 278, 71 O.O. 2d 255, 328 N.E. 2d 387; *State, ex rel. Campbell,* v. *Indus. Comm.* (1971), 28 Ohio St. 2d 154, 57 O.O. 2d 397, 277 N.E. 2d 219.

However, mandamus may only issue if relator has demonstrated a clear legal right to the relief sought. *State, ex rel. Hughes,* v. *Goodyear Tire & Rubber Co.* (1986), 26 Ohio St. 3d 71, 26 OBR 61, 498 N.E. 2d 459; *State, ex rel. Elliott,* v. *Indus. Comm.* (1986), 26 Ohio St. 3d 76, 26 OBR 66, 497 N.E. 2d 70; *State, ex rel. Teece,* v. *Indus. Comm.* (1981), 68 Ohio St. 2d 165, 22 O.O. 3d 400, 429 N.E. 2d 433. To show a clear legal right, relator must demonstrate that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State, ex rel. Hutton,* v. *Indus. Comm.* (1972), 29 Ohio St. 2d 9, 58 O.O. 2d 66, 278 N.E. 2d 34; *State, ex rel. Teece,* v. *Indus. Comm., supra.* Where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus will not lie. *State, ex rel. Milburn,* v. *Indus. Comm* (1986), 26 Ohio St. 3d 119, 26 OBR 102, 498 N.E.

---

[3] It is not necessary to reach the additional procedural issues raised by appellee Stover since we find that Kroger is not entitled to an appeal pursuant to R.C. 4123.519.

2d 440; *State, ex rel. Hughes, v. Goodyear Tire & Rubber Co., supra; State, ex rel. Elliott, v. Indus. Comm., supra; State, ex rel. Hudson, v. Indus. Comm.* (1984), 12 Ohio St. 3d 169, 12 OBR 237, 465 N.E. 2d 1289; *State, ex rel. Allerton, v. Indus. Comm.* (1982), 69 Ohio St. 2d 396, 23 O.O. 3d 358, 433 N.E. 2d 159; *State, ex rel. Teece, v. Indus. Comm., supra; State, ex rel. GF Business Equip., Inc., v. Indus. Comm.* (1981), 66 Ohio St. 2d 446, 20 O.O. 3d 379, 423 N.E. 2d 99.

## A

Kroger contends that the Industrial Commission abused its discretion in awarding benefits to Stover pursuant to R.C. 4123.57(C) because it refused to consider the improvement of his vision by virtue of the corneal transplants.

Kroger asserts that Stover's loss of vision in the right eye was only twenty-five percent not eighty percent, and that Stover was not entitled to an award for his left eye since permanent loss could not be calculated until a corneal transplant was performed. Dr. George T. Stine, a commission specialist, reported that Stover's *corrected* vision in the right eye was seventy-five percent visual acuity and ten percent in the left eye. However, the reports of both Dr. Stine and Dr. James M. Andrew indicate a percentage loss of eighty percent *uncorrected visual acuity* in the right eye and 96.7 percent in the left eye. The commission reasoned that "surgical repair of vision is 'correction' for the purposes of R.C. Section 4123.57(C), and not taken into account in making an award under that section."

R.C. 4123.57(C) provides in pertinent part:

"For the permanent partial loss of sight of an eye, such portion of one hundred twenty-five weeks as the commission may in each case determine, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. *'Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease.''* (Emphasis added.)

R.C. 4123.57(C) does not specify the measures of correction to be included under the term "uncorrected vision." The court of appeals held that glasses, contact lenses or corneal transplants are all means by which vision is corrected.

Kroger attempts to avoid the statutory language and the decision below, asserting that a loss which has been surgically repaired does not represent an *actual* loss. More specifically, Kroger argues that there is a distinction between optical prostheses, such as eyeglasses or contact lenses, and corneal transplants. Such a distinction could be made and presents a close case of first impression for this court.[4] To make the

---

[4] Cf. the Tenth District Court of Appeals' opinion in *State, ex rel. Swander, v. Indus. Comm.* (1983), 13 Ohio App. 3d 220, 13 OBR 271, 468 N.E. 2d 913.

distinction Kroger asks would require us to find that a corneal transplant is not merely corrective, but restores vision permanently. We decline to accept that position.

Undeniably Stover sustained the substantial vision loss found by the commission. His loss resulted from severe burning and scarring of his corneas. The question is whether a transplant eliminates the loss of vision or is a correction of vision. A corneal transplant does not necessarily result in permanent or trouble-free restoration. This conclusion is substantiated by the medical testimony in this case which shows that Stover has twice suffered a rejection of the grafts in his right eye, and that at the time there was reason to believe that rejection in the left eye was possible.[5]

We acknowledge that advances in medical technology might, at some future time, permit the conclusion that a corneal transplant eliminates the loss (as for example the re-setting of broken bones could). But, at the present and on this record, a corneal transplant is no more than a correction to lost vision. Indeed, a patient might well decide not to have a corneal transplant. The result we reach is fortified by R.C. 4123.95 which requires that R.C. 4123.01 to 4123.95, inclusive, be construed in favor of employees and their dependents.

Accordingly, we hold that the improvement of vision resulting from a corneal transplant is a correction to vision and, thus, shall not, on the current state of the medical art, be taken into consideration in determining the percentage of vision actually lost pursuant to R.C. 4123.57(C).

## B

Kroger also contends that the commission abused its discretion in awarding Stover benefits for permanent partial vision loss since there was no evidence before the commission from which it could conclude that Stover's loss was permanent. The medical records before the commission contain evidence that the corneal damage to Stover's eyes was permanent. Dr. Sanders M. Fowler, Stover's attending physician, reported that his disability was permanent. Dr. Hobart R. Helman also concluded that Stover was totally and permanently disabled secondary to his exposure to ammonia, and indicated that he would never be able to work, in part because of his severely impaired vision. Issues of credibility and the weight to be given evidence are within the commission's discretionary powers of

---

[5] Dr. Helman, in a letter written more than two years after the accident, described the functional limitations of Stover's vision loss as follows:

"* * * The corneal transplant was successful, the patient does have some vision with glasses, however bright light must be available. He is unable to see more than six feet if there is any cloudiness or absence of bright sunlight. For example, if it is cloudy during the day, or on a rainy day, or at dusk, or early morning, he is unable to drive his car or see well enough to ge [sic] about by himself, despite the corneal transplant."

The possibility of rejection of the implant in the left eye is suggested by Dr. Richard G. Lembach in a deposition submitted to the trial court. This was not before the commission inasmuch as the left eye transplant had not been performed at that time.

fact finding.[6] See *Teece, supra,* at 169, 22 O.O. 3d at 403, 429 N.E. 2d at 436.

## C

Finally, Kroger argues that the commission abused its discretion because the record did not indicate Stover's pre-injury visual acuity and, therefore, no calculation of the percentage of vision loss could be made. The court of appeals opined that since Stover's physicians reported his disability as a loss, they "inferentially" considered his vision before the accident. The court below also found no evidence that Stover's vision was subnormal prior to the accident. As stated, the resolution of such factual issues is within the discretion of the commission.

Further, the commission on January 1, 1953 adopted "Rules for Appraisal of Loss of Vision" which serve to guide ophthalmologists in their assessment of the extent of vision loss caused by industrial injuries and occupational diseases. Rule 11 provides:

"In claims in which there exists no positive evidence of pre-existing visual loss it shall be assumed that the visual efficiency was one hundred per cent."

The rules and regulations promulgated by the Industrial Commission to govern its procedures are valid and enforceable unless they are unreasonable or conflict with statutes covering the same subject. See *State, ex rel. DeBoe,* v. *Indus. Comm.* (1954), 161 Ohio St. 67, 69, 53 O.O. 5, 6, 117 N.E. 2d 925, 927. Moreover, we are required to give deference to an administrative agency's interpretation of its own rules and regulations. See, *e.g., Jones Metal Products Co.* v. *Walker* (1972), 29 Ohio St. 2d 173, 181, 58 O.O. 2d 393, 398, 281 N.E. 2d 1, 8; *Dempsey* v. *Chicago Title Ins. Co.* (1985), 20 Ohio App. 3d 90, 93, 20 OBR 111, 114, 484 N.E. 2d 1064, 1067; *North Sanitary Landfill, Inc.* v. *Nichols* (1984), 14 Ohio App. 3d 331, 337, 14 OBR 398, 404, 471 N.E. 2d 492, 500. Through the promulgation of Rule 11, the commission contemplated situations wherein ophthalmologists would have to determine the percentage of vision loss absent proof of pre-injury acuity. This is a reasonable and necessary rule inasmuch as a claimant without pre-injury visual efficiency records would be precluded from filing a claim seeking benefits for vision loss pursuant to R.C. 4123.57(C). The statute does not intend such harsh results.

Relator-appellant, Kroger, has not demonstrated the clear legal right that would entitle it to a writ of mandamus.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

---

[6] Kroger maintains that the commission's order is unsupported by the evidence since Stover can see. This assertion is untenable. R.C. 4123.57(C) authorizes an award of compensation for permanent *partial* vision loss of twenty-five percent or more. Thus, the fact that a claimant has some vision is inherently recognized in the statute itself.

Sweeney, Locher and Douglas, JJ., concur.

Moyer, C.J., and Wright, J., concur in part and dissent in part.

Holmes, J., dissents.

Wright, J., concurring in part and dissenting in part. I agree with the statement espoused in paragraph one of the syllabus, as well as Parts I and IIC of the majority's decision. However, I am compelled to express vigorous disagreement with the rationale contained within Parts IIA and B, and the second paragraph of the syllabus.

The focal point of this case centers upon the intent of the General Assembly in enacting R.C. 4123.57(C) which provides that:

"For the *permanent* partial *loss of sight of an eye,* such portion of one hundred twenty-five weeks as the commission may in each case determine, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. *'Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease."* (Emphasis added.)

Admittedly, the statute contains some measure of ambiguity since the General Assembly did not provide either the Industrial Commission or the courts of this state with guidelines pertaining to the measures of medical correction which impact upon "uncorrected vision." Thus, although "loss of uncorrected vision" is defined as the "percentage of vision actually lost," we are not told whether the phrase "actually lost" refers to the injured employee's condition immediately after the injury, or whether the condition should be evaluated after medical treatment or surgical repair has been performed.

I believe that all members of this court agree with the court of appeals when it reasoned that a claim for loss of vision under R.C. 4123.57(C) is not to be reduced because the claimant's vision has been improved after the industrial injury with the aid of either glasses or contact lenses. To measure an award under such circumstances would be to ignore the language requiring actual loss under R.C. 4123.57(C), and take into consideration the fact that a prosthetic device or other removable appliance is aiding in the restoration of the claimant's vision. By way of analogy, it cannot be seriously argued that a claim for the loss of a leg should be denied under R.C. 4123.57(C), simply because the injured worker is fitted with an artificial limb.

Nevertheless, in determining the time frame in which the commission must evaluate "the percentage of vision actually lost," it is important to note that R.C. 4123.57(C) requires *"permanent* partial loss of sight of an eye * * *."* (Emphasis added.) The requirement that some permanency attach prior to an award for loss of vision is a clear signal from the

legislature that the award is not to be predicated upon the state of the claimant's vision immediately after the industrial injury but, instead, within a reasonable time thereafter so as to allow for the effect of natural healing, medical treatment, surgical repair or rehabilitation.

Regrettably, the majority concludes that any improvement to vision as the result of corneal transplants is a correction to vision and cannot be considered when determining a loss of vision award under R.C. 4123.57(C). In reaching this conclusion, the majority states without explanation that "a corneal transplant is no more than a correction to lost vision." Presumably, the majority perceives corneal transplants as functionally equivalent to prosthetic devices such as contact lenses or glasses and, therefore, the court has determined that appellee's disability should be determined at the time he sustained the injury and not after advanced medical procedures had been invoked in order to alleviate damage caused by the injury. Such a posture is just plain wrong. More incredibly, the court concludes that "at some future time" corneal transplants may eliminate the loss, but at present, this procedure constitutes no more than a correction to vision. The majority reaches this conclusion about the current state of the art of corneal transplantation despite *no* such evidence in the record or citation to authority. One can only conclude that the court has *sua sponte* taken some form of judicial notice of the current state of successfulness of corneal transplants without sharing this "knowledge" with members of the bench, bar, or the Industrial Commission.

In urging affirmance of the allowance of benefits as ordered, the commission argues by way of analogy, that "a worker who loses 100% of the use of one thumb through a crushing injury, and has the thumb of a perfect tissue-matched donor grafted on after surgical removal of the worker's useless thumb, has nevertheless suffered the actual loss of his thumb, even if the transplant gives him 75% use of the new digit." Research reveals the existence of at least one case virtually identical to the analogy set forth by the commission. In that case the court reached a result contrary to that advocated by the commission and accepted by the majority.

Thus, in *Fogarty v. Rhode Island* (1967), 103 R.I. 228, 236 A. 2d 247, the employee suffered an industrial injury resulting in the severance of his left thumb, and damage so severe to the left index finger that it was rendered practically useless. Testimony was adduced demonstrating that immediately following the injury, the employee's hand was rendered seventy-five percent useless. Following the injury, however, extraordinary medical procedures were invoked whereby the damaged index finger was transplanted in place of the severed thumb, resulting in a twenty-five percent improvement in the hand.

The threshold consideration presented to the Rhode Island Supreme Court was "whether the percentage of employee's permanent loss of use of his left hand should be determined [for purposes of workers' compensa-

tion benefits] as of the time he sustained the injury [75% disability], or alternatively as of the time when surgery was completed and medical science had accomplished all it could to remedy the damage [resulting in a 50% disability to the hand]." *Id.* at 229, 236 A. 2d at 247. In resolving this issue, the court reasoned at 230, 236 A. 2d at 248, that prior to determining the usefulness of the claimant's hand, a "full opportunity" must be afforded to medical science in order to ameliorate the effects of the industrial injury. The court stressed that permanency was integral to a disability determination since the Rhode Island statute, like Ohio's, did not make an award for every loss, but, rather, for permanent losses. In at least one prior case, the Rhode Island court had determined that prosthetic devices were to be excluded when considering post-surgery disabilities. The claimant, relying on that rationale, as does the subject claimant and the Industrial Commission, maintained that the transplantation of the index finger in place of the severed thumb was functionally equivalent to the attachment of a prosthetic device. This rationale was ultimately rejected, when the court stated:

"The analogy in our judgment fails. Live tissue from an injured worker's body applied by a skilled surgeon as a replacement for an injured thumb is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial." *Id.* at 231, 236 A. 2d at 249.

A case even more analogous than *Fogarty* is *Lee Connell Constr. Co.* v. *Swann* (1985), 254 Ga. 121, 327 S.E. 2d 222. Therein, a worker sustained a lacerated cornea. Subsequent to the laceration, surgery was performed whereby a cataract was excised and a permanent lens was implanted into the employee's damaged eye. After the injury, but prior to the surgical implantation, the employee possessed 20/400 vision without the aid of glasses and 20/100 vision with glasses. After the implant, the employee had 20/40 vision without glasses and 20/20 vision with them. His claim for workers' compensation benefits was originally allowed based on 20/40 vision. The full board revised this award and granted the claimant benefits predicated upon total loss of the eye, in effect refusing to consider the improved vision subsequent to the surgical implant. Upon further review the lower court and the court of appeals affirmed the order of the board. *Lee Connell Constr. Co.* v. *Swann* (1984), 172 Ga. App. 305, 322 S.E. 2d 736.

After granting a writ of certiorari, the Supreme Court of Georgia reversed, stating at 121, 327 S.E. 2d at 223:

"1. The Court of Appeals equated the permanent lens implant with the wearing of eyeglasses or contact lens. We disagree, and adopt the view—consistent with the facts of the case and the advances of medical science—that vision has been restored to the eye to the extent of the correction of visual acuity resulting from the permanent lens implant. Larson's Workmen's Compensation Law, § 58.13(f).

"2. The claimant's uncorrected vision was 20/40 after vision had been

restored to the eye through the surgical procedure. The administrative law judge was authorized to enter an award based upon the claimant's need for eyeglasses after the surgical procedure to attain 20/20 corrected vision."

Both *Fogarty* and *Swann* recognize that a significant distinction exists between a prosthetic device and surgical restoration. It is common knowledge that glasses, which must be taken on and off, and contact lenses, which must be put in and taken out, are prosthetic devices which serve as constant reminders that vision is being corrected. Moreover, when these items are removed, lost or misplaced, the wearer suffers loss of vision. On the other hand, a corneal transplant is not a "prosthesis," a term commonly defined as "* * * an *artificial* device to replace a missing part of the body * * *." (Emphasis added.) Webster's Third New International Dictionary (1961) 1822. Conversely, a "transplant" involves the "* * * transfer ([of] an organ or tissue) from one body or part of a body to another * * *." *Id.* at 2430. Clearly, the claimant received a transplant and not a prosthesis, despite the reasoning of the majority. Moreover, the majority's reliance upon the term "correction," wherein corneal transplants are equated with corrective lenses, is equally unpersuasive.

As it relates to vision, the term "correction" means "* * * a setting right, as the provision of specific lenses for the improvement of vision * * *," and the term "lens" connotes "* * * a piece of glass or other transplant substance shaped as to converge or scatter the rays of light, *especially the glass used in appropriate frames or other instruments to increase the visual acuity of the human eye.*" (Emphasis added.) Dorland's Illustrated Medical Dictionary (26 Ed. 1981). Accordingly, when the term "correct[ion]" appearing within R.C. 4123.57(C) is read with its common, ordinary meaning in mind (see R.C. 1.42), it is apparent that the General Assembly intended that claimants seeking loss of vision awards should not be penalized for improvements to vision as a result of glasses or contact lenses, and not that corneal transplants or other corrective surgeries are to be excluded when determining loss of vision.

After a fair reading of the majority's opinion, one can only conclude that, rather than interpret R.C. 4123.57(C) as written, the majority elected to interpret the statute to achieve a result which they thought the General Assembly should have provided for in the first place. One must remain cognizant, however, that the statute does *not* provide that " '[l]oss of uncorrected vision' means the percentage of vision actually lost as a result of the injury or occupational disease [and post-injury surgical measures may not be considered when determining the claimant's award]." To interpret the statute in this fashion is to effectively insert words into the statute, rather than give effect to the words used by the General Assembly, in contravention of well-established rules of statutory construction. *Bernardini* v. *Bd. of Edn.* (1979), 58 Ohio St. 2d 1, 4, 12 O.O. 3d 1, 3, 387 N.E. 2d 1222, 1224; *Dougherty* v. *Torrence* (1982), 2 Ohio St. 3d 69,

70, 2 OBR 625, 626, 442 N.E. 2d 1295, 1296; *Ohio Assn. of Pub. School Emp.* v. *Twin Valley Local School Dist. Bd. of Edn.* (1983), 6 Ohio St. 3d 178, 181, 6 OBR 235, 238, 451 N.E. 2d 1211, 1214; *Cleveland* v. *Public Util. Comm.* (1984), 10 Ohio St. 3d 18, 20, 10 OBR 171, 173, 460 N.E. 2d 1113, 1115; *Bockover* v. *Ludlow Corp.* (1986), 23 Ohio St. 3d 190, 194, 23 OBR 352, 356, 492 N.E. 2d 149, 153. Moreover, the interpretation afforded R.C. 4123.57(C) by the majority will create a virtual Pandora's Box, with claimants stampeding to the Industrial Commission to argue that all post-injury medical and surgical procedures not be considered when evaluating disabilities. Taken to its logical extreme, one can envision some truly extraordinary results as in the case of a claimant with a compensable heart ailment who subsequently undergoes heart transplant surgery.

In order to buttress its judgment, the majority expresses concern that corneal transplants do not result in a guarantee of permanent or trouble-free vision restoration since each transplant is accompanied by the threat of rejection. I likewise share this concern, but nevertheless can find adequate protection in case rejection comes to pass within R.C. 4123.52, which in relevant part provides:

"The jurisdiction of the industrial commission over each case shall be continuing, and the commission may make such modification or change with respect to former findings or orders with respect thereto, as, in its opinion is justified. No such modification or change nor any finding or award in respect of any claim shall be made with respect to disability, compensation, dependency, or benefits, after six years from the date of injury in the absence of the payment of compensation for total disability under section 4123.56 of the Revised Code, or wages in lieu of compensation in a manner so as to satisfy the requirements of section 4123.84 of the Revised Code, except in cases where compensation has been paid under section 4123.56, 4123.57, or 4123.58 of the Revised Code, then ten years from the date of the last payment of compensation or from the date of death, nor unless written notice of claim for the specific part or parts of the body injured or disabled has been given as provided in section 4123.84 or 4123.85 of the Revised Code, and the commission shall not make any such modification, change, finding, or award which shall award compensation for a back period in excess of two years prior to the date of filing application therefor. This section does not affect the right of a claimant to compensation accruing subsequent to the filing of any such application, provided such application is filed within the applicable time limit as provided in this section.

*"This section does not deprive the commission of its continuing jurisdiction to determine the questions raised by any application for modification of award which has been filed with the commission after June 1, 1932, and prior to the expiration of the applicable period but in respect to which no award has been granted or denied during the applicable period."* (Emphasis added.)

Two critical limitation periods are contained within the first full paragraph of R.C. 4123.52. *State, ex rel. Consolidation Coal Co.*, v. *Indus. Comm.* (1985), 18 Ohio St. 3d 281, 283, 18 OBR 333, 334, 480 N.E. 2d 807, 809. The first limitation period requires that an application for disability, compensation, dependency or benefits be submitted within six years of the date of the claimant's injury. The second limitation period provides that "[i]f a claimant has, since the date of the injury, received temporary, partial or permanent total disability compensation under R.C. 4123.56, 4123.57 or 4123.58, respectively, or has received wages in lieu of compensation pursuant to R.C. 4123.84, then the commission may consider an application for additional *compensation* as long as the application is submitted within ten years of the last payment of such *compensation*." (Emphasis added.) *Id.* at 283, 18 OBR at 334, 480 N.E. 2d at 809. In December 1967, R.C. 4123.52 was amended to provide that only when a claimant receives compensation, as opposed to medical benefits, does such receipt operate to toll the ten-year limitation period.

A legitimate concern thus arises that, if the claimant undergoes a corneal transplant and rejects the tissue more than ten years after having received compensation under R.C. 4123.56, 4123.57, 4123.58, or wages in lieu of compensation under R.C. 4123.84, a further award under R.C. 4123.57(C) would be barred and leave the claimant without recourse through no fault of his own. However, a liberal reading (R.C. 4123.95) of the second paragraph of R.C. 4123.52 set forth above with respect to tissue transplant cases serves to ameliorate any such harsh consequences. That paragraph appears to allow the commission to hold an application for permanent partial disability benefits in abeyance until such time as a transplant rejection occurs. In the event a rejection does occur outside the ten-year limitation period, and the patient elects not to undergo another transplant procedure, then the claimant is protected against losing his right to seek benefits under R.C. 4123.57(C). Accordingly, subsequent to the commission's determination regarding appellee's current application under R.C. 4123.57(C), he could, within ten years, file another application for compensation contingent upon rejection, which the commission could hold in abeyance until such time as a rejection may occur.

Based on the foregoing rationale, I would affirm the judgment of the court of appeals insofar as it sustains the allowance of an award for eighty percent loss of vision in the claimant's right eye. Although Kroger, relying on the medical report of Dr. James M. Andrew, contends appellee has suffered only a twenty-five percent loss of vision in that eye subsequent to the transplant, the report of Dr. Hobart R. Helman, cited by the majority in footnote five, constitutes some evidence supporting the commission's decision. The most that can be said about the reports of Drs. Andrew and Helman is that a disputed factual situation was presented, the resolution of which was within the final jurisdiction of the commission. Accord *State, ex rel. GF Business Equip., Inc.*, v. *Indus. Comm.* (1981), 66 Ohio St. 2d 446, 20 O.O. 3d 379, 423 N.E. 2d 99. Since some evidence exists sup-

porting this conclusion, it can not be said that the commission abused its discretion when making the award for appellee's loss of vision in the right eye.

On the other hand, I can not agree with the majority that, despite a recent corneal transplant to the claimant's left eye of which there is no medical evidence before the commission indicating the state of acuity since that transplant was performed subsequent to its decision, appellee is entitled to an award for total loss of vision. By summarily concluding that corneal transplants may not be taken into consideration in determining loss of vision awards under R.C. 4123.57(C), the majority has failed to allow medical science and employers to ameliorate the effects of the industrial injuries through surgical restoration. Corneal transplantation is but one form of rehabilitation, and since rehabilitation constitutes a cornerstone of the foundation underlying Ohio's Workers' Compensation Act, I am unable to concur in that portion of the holding which erodes that foundation, especially where the reasoning therefor is unsupported by the statutory provision.

For the foregoing reasons, I would affirm in part and reverse in part the judgment of the court of appeals, and remand the cause to the Industrial Commission for further consideration as to what loss of acuity, if any, appellee has sustained in his left eye.

MOYER, C.J., concurs in the foregoing opinion.

HOLMES, J., dissenting. While I agree with much of the analysis set forth in Justice Wright's concurring and dissenting opinion, I am compelled to dissent entirely from the majority determination in this case. The decision of the Industrial Commission granting compensation for permanent loss of vision, under R.C. 4123.57(C), is fully incorrect.

The commission in its decision, contrary to the decision of the court of appeals below, did not base its findings upon "some evidence" which may have included the findings of Drs. Andrew, Fowler and Helman. Instead, the commission asserted, as a matter of law, "that surgical repair of vision is 'correction' for purposes of R.C. Section 4123.57(C), and not taken into account in making an award under that section." Such a *per se* rule is violative of the statute which mandates that no loss is a compensable loss unless it is shown to be *permanent*.

While I would not disagree with a decision predicated upon a weighing of conflicting evidence that particular surgery in a particular case either did or did not eliminate a loss, there is no doubt whatsoever that the term "permanent" cannot rationally be applied to a former injury in part of the body, when that part has thereafter been surgically renewed. The *per se* rule adopted by the commission and the majority opinion violates the legislative mandate that temporary injuries, *i.e.*, those of limited duration, receive separate treatment. R.C. 4123.56. By refusing to recognize that

surgery may ameliorate particular injuries, including those at issue, the majority has not only directed surgical cures out of the analysis but has allowed the term "permanent loss" to fully encompass an injury of limited duration.

The operation at issue, a keratoplasty, requires the transplantation of a living organ, the cornea, into the eye of one whose cornea has been injured or destroyed. Thereafter, the successfully implanted organ receives nourishment and oxygen from the blood of the recipient through the eye's pre-existing blood vessels. If injured, it heals itself.[7] It functions as, and becomes in fact, a living part of the recipient's living tissues, thus eliminating the prior loss. Consequently, to classify the results of this operation as a mere "correction to vision, " in the same category as a pair of glasses, ignores the obvious intent of the statute as well as its particular terms.

Moreover, the majority's characterization of keratoplasties as failing to "eliminate the loss" because of uncertainties in "the current state of the medical art" ignores the reality that such operations have been regularly performed as standard medical procedure since the 1940s.[8] Nor has the "current state of the medical art" diminished Stover's expectations and efforts at surgically obtaining normal, healthy eyes, since he had another transplantation surgery immediately following the Industrial Commission's award to him for permanent loss. As a matter of scientific fact, a successful keratoplasty will eliminate, on a permanent basis, any organic loss which Stover originally experienced. To the degree the new corneas do not provide the previously enjoyed standard of vision, their function may be corrected by artificial lenses, i.e., glasses.

The term "uncorrected vision" is the statutory base line for measuring the amount of damage to an eye. R.C. 4123.57(C). The majority would apply the term solely to that vision existing immediately following the injury, thus considering all surgeries to be of the same category as eyeglasses, i.e., corrections to vision. This interpretation will of course strain the statute to beyond the breaking point and strongly suggest a re-draft by the General Assembly. Actually, the statute uses the term "uncorrected vision" in the present tense, tying it to the date of evaluation of the injury. That being so, the commission is required to evaluate the applicant's vision on the date presented. Since the statute requires that the vision be so measured absent such corrections, whatever is comprehended by the term "correction" must, of necessity, refer to something then separate and apart from the vision itself. Vision, on the other hand, is that which the living eye sees. As previously mentioned, the cornea is a liv-

---

[7] See, generally, Mayer, Corneal Transplants, 1967 Medical Trial Technique Quarterly 107.

[8] *Id.* at 112.

ing organ, part of a larger organ, the eye. Whatever, therefore, is intended by the term "uncorrected vision," cannot be meant to exclude that which the unaided, living tissue of the eye perceives.

I would therefore reverse the commission's pronouncement of new law and would require proof of permanent injury to both eyes. Accordingly, I dissent.