DECISION
 IN MANDAMUS ON OBJECTIONS TO THE MAGISTRATE'S DECISION {¶ 1} On November 1, 2002, relator, Michael Pethe, filed this original action seeking a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied relator an award for the total loss of vision of his right eye and ordering the commission to find that relator is entitled to that compensation, or, in the alternative, to order the commission to vacate its order and conduct further proceedings in this cause.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, relator's complaint was referred to a magistrate of this court. The magistrate rendered a decision, which includes findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that the commission did not abuse its discretion in determining that relator did not meet his burden of proving total loss of vision in his right eye and recommended that this court deny the requested writ of mandamus. Relator filed objections to the magistrate's decision, and the matter is before this court for a full, independent review.
 {¶ 3} Relator's objections to the contrary, this court finds that the magistrate has properly discerned the pertinent facts and correctly applied the relevant law to those facts. Accordingly, this court, pursuant to Civ.R. 53(E)(4)(b), hereby overrules relator's objections and adopts the magistrate's May 12, 2003 decision as its own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, the requested writ of mandamus is denied.
Objections overruled; writ denied.
Watson and Deshler, JJ., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 IN MANDAMUS {¶ 4} Relator, Michael Pethe, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied him an award for the total loss of vision of his right eye, and ordering the commission to find that relator is entitled to that compensation.
 {¶ 5} Findings of Fact:
 {¶ 6} 1. Relator sustained a work-related injury on February 7, 2001. While relator was attempting to install a spring in a break assembly, both the spring and the screwdriver-like tool which relator had been using slipped free of the assembly. The spring hit relator in the face, knocking off his safety glasses, and the screwdriver struck him in the right eye. Relator's claim has been allowed for: "corneal abrasion, O.D. right eye."
 {¶ 7} 2. Relator was referred to Edward J. Rockwood, M.D., an ophthalmological surgeon at the Cleveland Clinic for treatment following his emergency room visit. Dr. Rockwood examined relator on March 5, 2001, and issued a report dated March 8, 2001. With regard to relator's right eye, Dr. Rockwood made the following observations:
 {¶ 8} "* * * [T]he right iris had a traumatic mydriasis, with a couple of sphincter tears. There was a bilateral early to moderate cataract. The right lens was significantly tilted, subluxed and very loose. There was very significant phacodonesis. There were a few cells in the anterior chamber of the right eye. * * *
 {¶ 9} "* * * At some point, he developed a primary open angle glaucoma in both eyes, which he apparently has neglected. More recently, he has suffered blunt ocular trauma in the right eye, which has caused dislocation of his cataractous lens. * * *"
 {¶ 10} Dr. Rockwood recommended the following treatment:
 {¶ 11} "For the right eye, one suggestion would include a combined procedure with myself and one of our vitreoretinal surgeons. Specifically, I would do a glaucoma implant and insert the tube into the posterior segment, in combination with a pars plana vitrectomy and lensectomy by one of vitreoretinal staff."
 {¶ 12} 3. On April 4, 2001, relator underwent a lensectomy and intraocular lens implant performed by Drs. Rockwood and Jonathan E. Sears, M.D. Relator was later examined by Charles L. Smith, M.D., at the request of the respondent-employer. Dr. Smith concluded that the lens dislocation and the resulting lensectomy were the direct result of relator's work-related injury. In the discussion portion of his report, Dr. Smith stated as follows:
 {¶ 13} "* * * Mr. Pethe has a difficult case to come up with the definitive diagnosis. The corneal abrasion is healed and would not explain the loss of vision that he has. I am unable to state the permanent loss of uncorrected vision in the right eye without knowing his preoperative visual acuity. (There is amblyopia of longstanding in the left eye.) His glaucoma is probably of longstanding, but the dislocated lens in the right eye which necessitated further surgery, was probably the result of the injury. Thus his permanent loss of corrected vision in the right eye is due both to the injury and the glaucoma. I cannot comment on the improvement of vision in the right eye due to glaucoma, and I suspect his vision loss is most likely due to the corneal abrasion. Without the lens implant, he would have had less then 20/400 vision because of the dislocated lens. Yes, I feel this lens implant is permanent. The claimant's prognosis is poor, but his lens implant will probably remain normal, and he may require a corneal transplant in the future."
 {¶ 14} 4. On November 15, 2001, relator filed a motion to have his claim allowed for scheduled loss/loss of use of his right eye claiming that he had suffered a total loss of vision in that eye.
 {¶ 15} 5. By order dated March 4, 2002, a district hearing officer ("DHO") granted relator's motion and awarded relator 125 weeks of scheduled loss compensation pursuant to R.C. 4123.57(B). The DHO noted that the April 1, 2001 surgery resulted in the removal of the lens of relator's right eye and that this surgery would constitute a total loss of vision under the statute and case law.
 {¶ 16} 6. The employer appealed and the matter was heard before a staff hearing officer ("SHO") on April 16, 2002. The SHO vacated the prior DHO order and denied relator's application as follows:
 {¶ 17} "The Staff Hearing Officer reviewed and considered all evidence on file at the time of hearing.
 {¶ 18} "The Staff Hearing Officer finds the injured worker has not met his burden of proof.
 {¶ 19} "The Staff Hearing Officer finds it is clear from the medical evidence that the injured worker did lose some vision in his right eye as a result of the injury. There is insufficient evidence to establish what percentage of vision was lost, post-injury.
 {¶ 20} "The Staff Hearing Officer finds no persuasive evidence of injured worker's pre-injury eyesight level. The record from 9/4/97 is not correct as it shows RX — 1.50 and Dr. Huss's 2/20/01 shows the injured worker was wearing a — 1.25 lens pre-injury, and documents injured worker's peripheral vision had disappeared in that eye `in the past year.'
 {¶ 21} "The post-injury medical evidence does not specifically designate a percentage of vision loss as a result of the injury, and corneal transplant cannot be considered, Hearing Officer Policy Manual Memo F2.
 {¶ 22} "Therefore, the calculations necessary pursuant to O.R.C.4123.57 and Hearing Officer Manual Policy Memo F1 cannot be made.
 {¶ 23} "The Staff Hearing Officer finds the injured worker has not met the burden of establishing the percentage of vision loss as a result of the injury. Consequently, the injured worker's request for a schedules [sic] loss of vision is denied.
 {¶ 24} "Any compensation previously paid for scheduled loss is found overpaid and shall be collected pursuant to O.R.C. 4123.511(J)."
 {¶ 25} 7. Further appeal was refused by order of the commission mailed May 21, 2002.
 {¶ 26} 8. Relator's request for reconsideration was denied by order of the commission mailed June 22, 2002.
 {¶ 27} 9. Thereafter, relator filed the instant mandamus action in this court.
 {¶ 28} Conclusions of Law:
 {¶ 29} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus.Comm. (1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond Foundry Co. (1987),29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981), 68 Ohio St.2d 165.
 {¶ 30} Relator's application for total loss of vision in his right eye was filed pursuant to R.C. 4123.57(B), which provides, in pertinent part, as follows:
 {¶ 31} "In cases included in the following schedule the compensation payable per week to the employee is the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code per week and shall continue during the periods provided in the following schedule:
 {¶ 32} "* * *
 {¶ 33} "For the loss of the sight of an eye, one hundred twenty-five weeks."
 {¶ 34} Relator contends that the commission abused its discretion in finding that he had failed to show what percentage of vision was lost post-injury. Relator contends that since he had the lens removed from his right eye and ultimately replaced, the removal of the lens resulted in total vision loss of that eye and that he did meet his burden of proof. Relator cites State ex rel. Kroger Co. V. Stover (1987), 31 Ohio St.3d 229, and State ex rel. Spangler Candy Co. v. Indus. Comm. (1988),36 Ohio St.3d 231, in support. For the reasons that follow, this magistrate finds that relator's argument is not well-taken.
 {¶ 35} Relator contends that, pursuant to Kroger, the surgical repair of his vision is considered "correction" for purposes of R.C.4123.57(B), formerly R.C. 4123.57(C), and is not taken into account in making an award under that section. In Kroger, the issue centered upon the term "uncorrected vision" which does not specifically apply in this case. In the Kroger case, the employer had asserted that a loss of vision which had been surgically repaired does not represent an actual loss. The claimant in Kroger had sustained a loss of vision as a result of severe burning and scarring of his corneas. The claimant had undergone a corneal transplant and the employer contended that the corneal transplant was not merely corrective, but that it actually restored one's vision permanently. Although the court acknowledged that advances in medical technology might, at some future time, permit the conclusion that a corneal transplant actually eliminates the loss, the court still concluded that the improvement of vision resulting therefrom was a correction of vision and should not be taken into consideration in determining the percentage of vision actually lost. The court held as follows at paragraph two of the syllabus:
 {¶ 36} "The improvement of vision resulting from a corneal transplant is a correction to vision and thus, shall not, on the current state of the medical art, be taken into consideration in determining the percentage of vision actually lost pursuant to R.C. 4123.57(C)."
 {¶ 37} In Kroger, the court did not consider the claimant's vision loss to be 100 percent simply because the claimant underwent a corneal transplant. The commission and the court had before it reports from Drs. Stein and Andrew indicating a percentage loss of 80 percent uncorrected visual acuity in the right eye and 96.7 percent in the left eye. It was undeniable that the claimant had sustained a substantial loss of vision. The question before the court was whether the transplant eliminated the loss of vision or whether it was a correction of vision. The court found that the transplant was a correction of vision but did not, as relator suggests, find that the fact of the transplant, in and of itself, was evidence of a 100 percent loss of vision.
 {¶ 38} In Spangler, the injured worker sustained an eye injury while operating a lathe and moved for an award for loss of vision pursuant to former R.C. 4123.57(C). The Supreme Court of Ohio agreed with the commission's method of calculating the loss as follows:
 {¶ 39} "The commission calculated claimant's percentage of vision loss by deducting the amount of vision remaining in the eye from the percentage of vision claimant had before the allowed injury. * * *" Id. at 235.
 {¶ 40} The holding in Spangler requires that the commission must determine the amount of a claimant's pre-injury vision that was lost due to the injury. Relator contends that the evidence establishes that he lost 100 percent of his vision as a result of the injury because he was required to undergo surgery to remove the lens from his right eye and replace it with a new lens.
 {¶ 41} In the present case, the commission determined that relator did not meet his burden of proof. The commission concluded that it was clear from the medical evidence that relator did lose some vision in his right eye as a result of the injury. However, the commission found that there was insufficient evidence to establish what percentage of vision was lost, either 100 percent or otherwise, post-injury. Relator points to Dr. Smith's report; however, Dr. Smith's report does not include any statements concerning the amount of loss. Instead, Dr. Smith made these comments:
 {¶ 42} "* * * His glaucoma is probably of longstanding, but the dislocated lens in the right eye which necessitated further surgery, was probably the result of the injury. * * * I cannot comment on the improvement of vision in the right eye due to glaucoma, and I suspect his vision loss is most likely due to the corneal abrasion. Without the lens implant, he would have had less then 20/400 vision because of the dislocated lens. * * *"
 {¶ 43} Earlier, Dr. Smith noted that relator had "chart vision only in both eyes" prior to the surgery. As such, without any injury to the left eye, relator had nothing more than chart vision in that eye. The record indicates that, pre-injury, relator's vision in his right eye was corrected to 20/20 with glasses. Furthermore, Dr. Smith indicated in his report that he was "unable to state the permanent loss of uncorrected vision in [relator's] right eye without knowing his preoperative visual activity."
 {¶ 44} Dr. Smith's speculation as to what relator's post-injury vision would have been does not constitute evidence detailing a total loss of vision due to the work-related injury.
 {¶ 45} Furthermore, as the commission noted in its order, Dr. Huss's reports contained inconsistent information regarding relator's vision in his right eye and likewise do not constitute sufficient evidence.
 {¶ 46} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion in determining that he did not meet his burden of proving total loss of vision in his right eye and this court should deny relator's request for a writ of mandamus.
Stephanie Bisca Brooks Magistrate.