[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 98.]

THE STATE EX REL. WELKER, APPELLANT AND CROSS-APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *State ex rel. Welker v. Indus. Comm.*, 2001-Ohio-292.]

*Workers' compensation—Application for scheduled loss compensation under R.C. 4123.57(B) based on amputation of entire left thumb—Court of appeals' judgment affirming Industrial Commission's denial of amputation benefits affirmed—Successful reattachment of thumb precludes any award for amputation—Court of appeals' judgment that Industrial Commission had not adequately addressed the loss-of-use issue reversed, when.*

(No. 99-912—Submitted November 14, 2000—Decided March 7, 2001.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Franklin County, No. 98AP-136.

————————————

*Per Curiam.*

{¶ 1} Appellant-claimant Randall A. Welker suffered a serious industrial injury to his left thumb. When he was transported initially to the closest emergency room, claimant's thumb hung by only a sliver of skin and muscle. After transfer to another facility, two surgeries were performed to reattach the digit.

{¶ 2} The procedure was successful. Three months after the surgery, one of the surgeons, Dr. John Biondi, reported:

"His thumb looks excellent without any signs of infection. * * * X-Rays taken on 7/1/93 show excellent consolidation. He has no pain in the thumb and I am going to send him to therapy for ROM [range of motion] exercises and strengthening."

{¶ 3} One month later he wrote:

"X-rays show complete consolidation, his thumb looks quite good and he has good motion at the MP joint although it is fairly stiff out at the IP joint. He has excellent sensation and at this point I want to see him back for a final check in six months."

{¶ 4} Claimant eventually returned to his former position of employment. An examination by Dr. Mark E. Weaver in July 1995 assessed an eight percent permanent partial impairment. That November, Dr. Kenneth M. Cardlin described claimant's thumb as "very functional" and having "remarkably preserved function." He reported that "[t]he patient states he is performing most usual activities, although [he] avoids the heaviest of lifting due to uncertainty as to prolonged gripping."

{¶ 5} Claimant applied to appellee Industrial Commission of Ohio for scheduled loss compensation under R.C. 4123.57(B) based on "the amputation of the total left thumb."

{¶ 6} In a lengthy order, the commission denied an award because (1) the thumb had been successfully reattached and (2) there was no evidence of a permanent and total loss of use of the digit.

{¶ 7} The Court of Appeals for Franklin County, in mandamus, upheld the commission's denial of amputation benefits. It held, however, that the commission had not adequately addressed the loss-of-use issue and ordered the commission to give it further consideration. This cause is now before this court upon an appeal and cross-appeal as of right.

{¶ 8} R.C. 4123.57(B) [1] provides a compensation schedule for the loss of enumerated body members, designating a number of weeks of compensation for loss of each member. Originally covering loss by amputation — with the obvious exceptions of hearing and sight, which were measured by different standards —

---

1. Formerly R.C. 4123.57(C).

compensation was later expanded to include a loss of use. *State ex rel. Walker v. Indus. Comm.* (1979), 58 Ohio St.2d 402, 12 O.O.3d 347, 390 N.E.2d 1190. A compensable loss of use, however, must be " 'to the same effect and extent as if [the body part] had been amputated or otherwise physically removed.' " *Id.* at 403-404, 12 O.O.3d at 348, 390 N.E.2d at 1192, quoting *State ex rel. Gassmann v. Indus. Comm.* (1975), 41 Ohio St.2d 64, 67, 70 O.O.2d 157, 159, 322 N.E.2d 660, 662. Consequently, the only compensable loss of use under R.C. 4123.57(B) is a permanent and total one.

**{¶ 9}** Claimant's entitlement to R.C. 4123.57(B) compensation, by either means, is at issue by virtue of the commission's order — which discussed both — and the court of appeals' decision that ordered the commission to further consider loss of use. Upon review, we affirm that judgment only in part.

**{¶ 10}** Regarding claimant's amputation, one question is raised: Should claimant's eligibility for his scheduled loss award be determined as of the time he was injured or from the point of reattachment and recovery? We find in favor of the latter.

**{¶ 11}** Claimant relies on two cases in advocating the former: *State ex rel. Mansfield Tire & Rubber Co. v. Indus. Comm.* (1973), 40 Ohio App.2d 417, 69 O.O.2d 371, 320 N.E.2d 742; and *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356. *Mansfield Tire* examined whether a claimant who had lost by accidental amputation most of his thumb and fingers could be compensated for the loss of a hand. In answering affirmatively, the court of appeals stated that the presence of a stump beyond the wrist was not determinative. In so doing, it observed:

"[W]e have evidence of severance of the major portions of both hands without evidence of loss of use. We find that the question of loss of use is irrelevant to the determination of the issue herein. *For if there were a total and complete severance of the hands, but the stumps were fitted with artificial hands, which,*

*through the miracle of modern technology, would restore the ability of claimant to function as well as before the amputation, there would be no question that there would be a compensable severance under the law * * *.*" (Emphasis added.) *Id*. at 419, 69 O.O.2d at 372, 320 N.E.2d at 743.

{¶ 12} Claimant offers the highlighted language to support his assertion that medical efforts to ameliorate damage are irrelevant to eligibility for compensation under R.C. 4123.57(B). Claimant, however, overlooks the key distinction between his case and *Mansfield Tire*. His case does not involve a prosthetic device, but, instead, a reattachment of the severed digit itself. As the Rhode Island Supreme Court noted after rejecting a similar attempt to equate the two:

"The employee * * * argues that the substitution of his index finger for a severed thumb should be equated with the furnishing of a prosthetic device. The analogy in our judgment fails. Live tissue from an injured workers' body applied by a skilled surgeon as a replacement for an injured thumb is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial." *Fogarty v. State* (1967), 103 R.I. 228, 236 A.2d 247, 248-249.

{¶ 13} There is no dispute among the litigants or the judiciary that a prosthesis does not foreclose an amputation award under the statute. See *Kroger, supra*. That is not, however, the issue before us.

{¶ 14} Claimant's stronger case is *Kroger,* a decision that generated considerable discussion by a divided court. There, an industrial burn caused an eighty percent loss of vision of the claimant's right eye. A successful cornea transplant ultimately reduced that loss to twenty-five percent. Claimant received an award for the eighty percent loss nevertheless, and Kroger's challenge eventually ended up here.

{¶ 15} Controversy centered on the parameters of "uncorrected vision," the vaguely defined measure of loss. Claimant argued that glasses, contacts, and corneal transplants were all corrective means, and since the first two clearly did not

prohibit recovery, neither did a transplant. Kroger responded that there was a distinction between optical devices such as glasses and contacts and a cornea transplant.

{¶ 16} The majority, in ultimately siding with the claimant, acknowledged that Kroger's "distinction could be made and presents a close case of first impression for this court." *Id.* at 233, 31 OBR at 440, 510 N.E.2d at 360. Kroger's position was rejected, however:

"To make the distinction Kroger asks would require us to find that a corneal transplant is not merely corrective, but restores vision permanently. We decline to accept that position.

"Undeniably Stover sustained the substantial vision loss found by the commission. His loss resulted from severe burning and scarring of his corneas. The question is whether a transplant eliminates the loss of vision or is a correction of vision. A corneal transplant does not necessarily result in permanent or trouble-free restoration. This conclusion is substantiated by the medical testimony in this case which shows that Stover has twice suffered a rejection of the grafts in his right eye, and that at the time there was reason to believe that rejection in the left eye was possible.

"We acknowledge that advances in medical technology might, at some future time, permit the conclusion that a corneal transplant eliminates the loss (as for example the re-setting of broken bones could). But, at the present and on this record, a corneal transplant is no more than a correction to lost vision. Indeed, a patient might well decide not to have a corneal transplant." *Id.* at 233-234, 31 OBR at 440, 510 N.E.2d at 360-361.

{¶ 17} Vigorously dissenting were Justices Holmes and Wright. Justice Wright focused on the statutory definition of "loss of uncorrected vision" as "the percentage of vision actually lost as the result of the injury." He noted that the statute did not specify "whether the phrase 'actually lost' refers to the injured

employee's condition immediately after the injury, or whether the condition should be evaluated after medical treatment or surgical repair has been performed." *Id*. at 236, 31 OBR at 442, 510 N.E.2d at 362.

{¶ 18} Justice Wright stressed that inherent in the award was a *permanent* loss and that permanency was "a clear signal from the legislature that the award is not to be predicated upon the state of the claimant's vision immediately after the industrial injury but, instead, within a reasonable time thereafter so as to allow for the effect of natural healing, medical treatment, surgical repair or rehabilitation." *Id.* at 236-237, 31 OBR at 442, 510 N.E.2d at 363. He added:

"Regrettably, the majority concludes that any improvement to vision as the result of corneal transplants is a correction to vision and cannot be considered when determining a loss of vision award under [former] R.C. 4123.57(C). In reaching this conclusion, the majority states without explanation that 'a corneal transplant is no more than a correction to lost vision.' Presumably, the majority perceives corneal transplants as functionally equivalent to prosthetic devices such as contact lenses or glasses and, therefore, the court has determined that appellee's disabilit[ies] should be determined at the time he sustained the injury and not after advanced medical procedures had been invoked in order to alleviate damage caused by the injury. Such a posture is just plain wrong. More incredibly, the court concludes that 'at some future time' corneal transplants may eliminate the loss, but at present, this procedure constitutes no more than a correction to vision. The majority reaches this conclusion about the current state of the art of corneal transplantation despite *no* such evidence in the record or citation to authority." (Emphasis *sic*.) *Id*. at 237, 31 OBR at 442-443, 510 N.E.2d at 363.

{¶ 19} Justice Holmes shared concerns over the permanency of loss:

"[T]here is no doubt whatsoever that the term 'permanent' cannot rationally be applied to a former injury in part of the body, when that part has thereafter been surgically renewed. The *per se* rule adopted by the commission and the majority

opinion violates the legislative mandate that temporary injuries, *i.e.,* those of limited duration, receive separate treatment. R.C. 4123.56. By refusing to recognize that surgery may ameliorate particular injuries, including those at issue, the majority has not only directed surgical cures out of the analysis but has allowed the 'permanent loss' to fully encompass an injury of limited duration.

"The operation at issue, a keratoplasty, requires the transplantation of a living organ, the cornea, into the eye of one whose cornea has been injured or destroyed. Thereafter, the successfully implanted organ receives nourishment and oxygen from the blood of the recipient through the eye's pre-existing blood vessels. If injured, it heals itself. It functions as, and becomes in fact, a living part of the recipient's living tissues, thus eliminating the prior loss. Consequently, to classify the results of this operation as a mere 'correction to vision,' in the same category as a pair of glasses, ignores the obvious intent of the statute as well as its particular terms.

"Moreover, the majority's characterization of keratoplasties as failing to 'eliminate the loss' because of uncertainties in 'the current state of the medical art' ignores the reality that such operations have been regularly performed as standard medical procedures since the 1940s. Nor has the 'current state of the medical art' diminished Stover's expectations and efforts at surgically obtaining normal, healthy eyes, since he had another transplantation surgery immediately following the Industrial Commission's award to him for permanent loss. As a matter of scientific fact, a successful keratoplasty will eliminate, on a permanent basis, any organic loss which Stover originally experienced. To the degree the new corneas do not provide the previously enjoyed standard of vision, their function may be corrected by artificial lenses, *i.e.*, glasses." (Footnotes omitted.) *Id*. at 242-243, 31 OBR at 447-448, 510 N.E.2d at 367.

{¶ 20} Permanency of loss was also addressed in Rhode Island — the only other jurisdiction to confront this issue. In *Fogarty*, *supra*, surgeons fashioned a

digit from a damaged finger and reattached it at the site of the accidentally severed thumb.  Hand function was greatly enhanced as a result.

{¶ 21} In determining the point from which to determine extent of loss, the claimant and employer advanced the same arguments seen here.  The *Fogarty* court ruled for the employer, reasoning:

"A full opportunity for achieving whatever beneficial effects medical science may have on an injury must of necessity precede any determination of what has been the percentage of loss of usefulness.  Until those effects can, without speculating or delving into mere possibilities, be reasonably foretold, it is impossible to ascertain what will be the percentage of the permanent loss of usefulness. * * *  It is permanency which is essential because it is only for a *permanent* loss, not for any loss, that the statute provides benefits." (Emphasis *sic*.)  *Fogarty*, 103 R.I. at 230-231, 236 A.2d at 248.

{¶ 22} Adopting claimant's point-of-injury position runs counter to most workers' compensation principles.  For purposes of determining permanent total disability, for example, maximum medical improvement can never be assessed until time has established that treatment and rehabilitation have run their course.  See Ohio Adm.Code 4121-3-32(A)(1) and its definition of "maximum medical improvement."  More broadly, the entire scheme has been adjudicated as generally unamenable to the application of *res judicata* simply because the passage of time alters a claimant's condition.  *State ex rel. B.O.C. Group, Gen. Motors Corp. v. Indus. Comm.* (1991), 58 Ohio St.3d 199, 569 N.E.2d 496.

{¶ 23} Equally important, as touched upon early in *Fogarty*, reattachment is the closest possible way of returning the claimant to a preinjury state and eliminates the element of disfigurement which probably played a part in the creation of the scheduled-loss concept.

{¶ 24} In this case, it is simply ignoring reality to pretend that claimant's amputation was the end of the story.  And continuing jurisdiction can keep the story

alive and allow for a scheduled loss award if the reattachment, somewhere down the road, becomes ineffective. At this time, however, claimant has not sustained the requisite loss to qualify for an award under R.C. 4123.57(B).

{¶ 25} Turning to the issue of loss of use without regard to amputation, the court of appeals found through its magistrate that the commission did not adequately discuss the issue, based on *State ex rel. White v. U.S. Gypsum Co.* (1990), 49 Ohio St.3d 134, 551 N.E.2d 139. That case, however, is distinguishable. In *White*, the commission denied a loss-of-use award based on reports that specifically found that claimant *did* have a permanent and total loss. The court ordered the commission to further clarify its order. Here, the commission cited evidence that did indeed say that claimant had remarkably preserved function in the reattached thumb, which contradicts a finding of loss of use. Consequently, a writ of mandamus is inappropriate.

{¶ 26} That portion of the court of appeals judgment that found claimant ineligible for compensation for amputation is affirmed. The balance is reversed.

*Judgment reversed in part*

*and affirmed in part.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS and RESNICK, JJ., dissent and would affirm the judgment of the court of appeals in its entirety.

————————————

*Green, Haines, Sgambati, Murphy & Macala Co., L.P.A., Ronald E. Slipski* and *Steven L. Paulson*, for appellant and cross-appellee.

*Betty D. Montgomery*, Attorney General, and *Craigg E. Gould*, Assistant Attorney General, for appellee and cross-appellant Industrial Commission.

*Manos, Pappas & Stefanski Co., L.P.A., Leonard J. Pappas* and *James A. Neff*, for appellee and cross-appellant Northeast Fabricators, Inc.

_____