DECISION IN MANDAMUS ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, General Electric Corporation ("relator") commenced this original action requesting the court to issue a writ compelling respondent the Industrial Commission of Ohio ("commission") to vacate its order granting compensation for total loss of use of both eyes to respondent Randall Ross under R.C. 4123.57(B), and issue a new order denying compensation for total loss of use.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who rendered a decision including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate decided the requested writ of mandamus should be granted. Claimant Randall Ross ("claimant") has filed objections to the magistrate's decision.
 {¶ 3} In his objections, claimant argues the magistrate erred in applying Ohio law with regard to a loss of vision award under R.C. 4123.57(B). Claimant objects to the magistrate's emphasis that the commission did not find any loss of vision at the time of his application for benefits or at the time of the evidentiary hearing.
 {¶ 4} Claimant further argues that the magistrate erred in finding that State ex rel. Kroger Co. v. Stover (1987),31 Ohio St.3d 229, did not apply. In Kroger, the claimant sustained severe burns and scarring to both his corneas in an industrial injury and underwent a corneal transplant to the right eye.[1] The controversy centered on the meaning of "uncorrected vision" in the statute.[2] The critical question was whether the corneal transplant eliminated the loss of vision or was merely a correction to vision. The court held that a corneal transplant should not "on the current state of the medical art" be taken into consideration in determining loss of vision under R.C. 4123.57(C), now (B). Id. at 234. For various reasons, the court ultimately felt that the transplant did not eliminate the loss.
 {¶ 5} Here, the magistrate distinguished claimant's situation to that in Kroger. We agree and find Kroger inapplicable to the present situation. In order for relator to receive benefits under R.C. 4123.57(B), there must be a permanent "loss" of sight of an eye. State ex rel. Welker v. Indus. Comm. (2001),91 Ohio St.3d 98. In Welker, the Ohio Supreme Court held that the successful reattachment of claimant's thumb precluded him from recovering benefits for a permanent loss under R.C. 4123.57. The court discussed the dissenting opinions in Kroger at great length. Id. at 101-103. The court further held that the loss must be determined not at the point of injury, but rather at the point of reattachment and recovery.
 {¶ 6} The court finds that based on the evidence in this case, claimant's eyes were fully repaired surgically in a way similar to the way in which a severed finger can be reattached.Welker, supra. There have been significant advances in medical technology with regard to cataract surgery. It is as if the person receives a completely new set of eyes. Here, the record demonstrates that claimant's surgery was completely successful and restored his vision to 20/20 and there is no evidence to suggest any complications. As the dissent stated in Kroger, and the court recited in Welker, with respect to permanency of loss, "`[T]here is no doubt whatsoever that the term "permanent" cannot rationally be applied to a former injury in part of the body, when that part has thereafter been surgically renewed.'"Welker, supra, at 102, quoting Kroger, supra, dissenting opinion (J. Holmes). Therefore, we find the commission abused its discretion in awarding benefits to claimant under the circumstances presented in this case. Claimant's successful cataract surgery eliminated any actual permanent loss suffered as a result of the accident.
 {¶ 7} Although claimant also argues that the magistrate erred in considering medical evidence that was not included in the record, we find the record itself is sufficient to support our conclusion. To the extent that any problem should arise in the future with respect to claimant's vision, claimant may seek compensation under R.C. 4123.57(B) at that time.
 {¶ 8} Following an independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's findings of fact and conclusions of law contained therein to the extent consistent with this opinion. In accordance with the magistrate's decision, the requested writ of mandamus is granted and the order of the commission is vacated.
Objections overruled;
writ granted.
LAZARUS, P.J., and SADLER, J., concur.
 IN MANDAMUS {¶ 9} In this original action in mandamus, relator, General Electric Corporation, asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its orders granting compensation for total loss of use of both eyes to respondent Randall Ross under R.C. 4123.57(B), and to issue a new order denying compensation for total loss of use.
 Findings of Fact {¶ 10} 1. In June 1996, Randall Ross ("claimant") sustained an industrial injury when he experienced an electric shock. By July 1999, he had developed cataracts in both eyes, which substantially impaired his vision as they worsened. Although the formation of cataracts is a normal part of the aging process, these cataracts were premature, due to the industrial injury, and were allowed in his workers' compensation claim in 2000.
 {¶ 11} 2. Ramesh M. Kode, M.D., recommended cataract surgery, which was approved by the Ohio Bureau of Workers' Compensation.
 {¶ 12} 3. In December 2000, a cataract was removed from the right eye using phacoemulsification/aspiration techniques, and a foldable lens was inserted. No sutures were used.
 {¶ 13} 4. In February 2001, the cataract was removed from the left eye, again using phacoemulsification/aspiration techniques, and a foldable lens was inserted. No sutures were used.
 {¶ 14} 5. In March 2001, Dr. Kode examined claimant and reported that claimant's visual acuity was 20/20 without glasses.
 {¶ 15} 6. In October 2001, Dr. Kode examined claimant's eyes again and found that the eyes' status was stable. Claimant was functioning well with 20/20 vision, and Dr. Kode recommended annual checkups.
 {¶ 16} 7. In April 2001, Frederick M. Kapetansky, M.D., a professor at The Ohio State University, reviewed the medical file to provide an opinion as to claimant's percentage of permanent loss of vision. He noted that, although the records did not establish claimant's preinjury visual acuity, the two medical reports of March 2001 and October 2001 established that claimant's visual acuity, without correction, had been restored to normal. Accordingly, Dr. Kapetansky found that there was no percentage of vision lost.
 {¶ 17} 8. In February 2002, Dr. Kode provided a report stating that, prior to the cataract surgery, claimant had substantial loss of vision due to cataracts. He opined that, before cataract surgery, claimant's vision "glared to approximately 20/200, which is the level of legal blindness in the state of Ohio," but that, after the surgery, claimant's visual acuity was 20/20.
 {¶ 18} 9. In November 2001, claimant filed an application for compensation for permanent partial disability, seeking a scheduled-loss award under R.C. 4123.57(B) for total loss of vision of both eyes.
 {¶ 19} 10. In April 2002, a district hearing officer granted permanent partial disability compensation for total loss of vision in both eyes:
 {¶ 20} "The claimant's motion requesting an award for the loss of vision bilaterally is granted.
 {¶ 21} "The District [H]earing Officer finds that the claimant suffered a total loss of vision as a result of the industrial accident of 6/17/96 based on the reports of Dr. Kade [sic] dated 2/5/02.
 {¶ 22} "Therefore, the claimant is granted an award pursuant to O.R.C. 4123.57 for the loss of vision bilaterally.
 {¶ 23} "The District Hearing Officer further bases this finding on the fact that the claimant underwent bilateral lens transplants and the Supreme Court holding in State ex rel.Kroger Company v. Stover et al (1987)31 Ohio St.3d 229.
 {¶ 24} "All evidence on file was reviewed.
 {¶ 25} "This order is based on the report(s) of Dr(s). Kade [sic]."
 {¶ 26} 11. In May 2002, a staff hearing officer affirmed, granting compensation for total loss of vision in both eyes:
 {¶ 27} "The claimant's C-86 motion filed 11-7-01 requesting loss of vision bilaterally pursuant to Ohio Revised Code 4123.57
is granted.
 {¶ 28} "The Staff Hearing Officer finds no evidence of the claimant's pre-injury visual acuity. Absent such evidence, the Staff Hearing Officer finds that it is assumed that the claimant's visual efficiency was 100%.
 {¶ 29} "Following the industrial injury the claimant developed cataracts and the claimant's vision deteriorated to 20/200. Dr. Kode considered this level of visual acuity to be legally blind.
 {¶ 30} "Subsequently, the claimant had cataract surgery and intraocular lens implants for his eyes — the right eye surgery was completed on 12-6-00 the left eye surgery was completed on 2-1-01.
 {¶ 31} "The Staff Hearing Officer finds that claimant is entitled to a total loss of vision for his left and right eye, as the claimant had no impairment prior to the injury and 20/200 vision after the injury.
 {¶ 32} "The Staff Hearing Officer finds that the improvement in the claimant's eyesight following the 12-00 and 2-01 surgeries is no more than a correction to vision and as such is not to be taken into consideration in determining the percentage of vision actually lost.
 {¶ 33} "In coming to this conclusion the Staff Hearing Officer relies on Ohio Revised Code 4123.57(C) State exrel. Kroger v. Stover (1987), 31 Ohio St.3d 229, Clermont Mercy Hospital (12-4-00 and 2-1-01), Dr. Kode (2-5-02) and Industrial Commission medical examination manual 9-10-82."
 {¶ 34} 12. Further appeal was refused.
 {¶ 35} General Information from the Medical Literature:
 {¶ 36} 1. A cataract of the eye is a lens opacity or fogging of the lens. In cataract surgery, the opaque tissue is removed and, in more than 90 percent of all cataract operations in the United States, a synthetic intraocular lens is implanted. D. Vaughan, M.D., T. Asbury, M.D., P. Riordan-Eva, F.R.C.S., General Ophthalmology (14 Ed. 1995), Chapters 6, 8. See, also, The Merck Manual (17 Ed. 1999), Chapter 97.
 {¶ 37} 2. Cataract surgery changed dramatically between 1975 and 1995, principally as a result of the operating microscope, better instrumentation, better suture material, and improvements of lens implants. In the United States, cataract surgery was not an outpatient procedure until 1984 (by federal regulation), but by 1995 the procedure could be performed with new techniques that permitted patients to be ambulatory after the surgery was finished. Some patients require glasses or other corrective lenses after the surgery, but must wait six to eight weeks after surgery to have them fitted. General Ophthalmology; Merck Manual, supra.
 {¶ 38} 3. Between 1991 and 2001, major advances in cataract surgery techniques, equipment, and pharmacologic strategies decreased the risk of postoperative complications. El-Harazi 
Feldman, Current Opinion in Ophthalmology (2001) 4-8.
 {¶ 39} 4. According to the National Eye Institute, cataract surgery is the most frequently performed surgery in the United States, with over 1.5 million cataract surgeries performed each year. Cataract surgery has a success rate of about 98 percent. Advances in technology have provided new lens materials, such as soft silicone, acrylic, and hydrogels, which are flexible and foldable. These foldable lenses permit surgery through smaller incisions, and they also can improve the patient's distance vision and near vision. In addition, a new technique permits doctors to break up the cataract with high-frequency ultrasound. U.S. Govt. Printing Office, The FDA Consumer (2002), 22, Section 2, Vol. 36.
 {¶ 40} 5. Cataract surgery can now be performed by making a tiny incision of the eye's lens capsule and breaking up the cataract with an ultrasonic needle and then suctioning the cataract material out. A plastic lens implant is used in most cataract operations. See "Medical Advances Favor Cataract Treatment," University Arkansas Medical Science Update (2000), reprinted at www.uams.edu/jei/home (downloaded Apr. 11, 2003). See, also, Merck Manual, supra.
 {¶ 41} 6. Before recent medical advances, the accepted method of cataract surgery was to open the front portion of the eye and pluck the cataract out like a grape. At first, there were no suitable materials to use as sutures in the eyes, so patients' heads were immobilized with sandbags following cataract surgery to prevent movement of the eye tissues during healing. Sutures for eye surgery were a major advance, but they have now been supplanted in most cases by the use of a self-sealing incision: the surgeon makes a flap incision that uses the natural fluid pressure of the eye to seal the incision shut without the need for sutures.
 {¶ 42} To perform this "no-stitch" cataract surgery, two other technological advances were necessary: the development of microsurgery equipment and the invention of foldable implants. High-powered microscopes allow the surgeon to view the parts of the eye clearly. In addition, a tiny incision is now sufficient because doctors can use an ultrasound probe about the width of a matchstick to remove the cataract. After using ultrasound to dissolve the cataract, the doctor gently vacuums it from the eye. Then the doctor places a tiny artificial lens inside the eye, which can provide dramatically clear vision. These lenses are made of inert materials that do not trigger any rejection response by the body. By making careful measurements of the eye prior to the surgery, the doctor can often select a lens that not only replaces the cloudy lens but also reduces nearsightedness or farsightedness. See "Advances in Cataract Surgery," (2003), reprinted at www.steen-hall.com (downloaded Apr. 11, 2003).
 {¶ 43} 7. Another advance in cataract surgery is that microprocessors help control the important balance between fluid and emulsified cataract material being removed from the eye and the fluid that is used to replace it, thus providing better stability of the eye during surgery, giving the surgeon better control and permitting shorter duration of surgery. "Advances in Cataract Surgery," reprinted at www.-barbaneye.com (downloaded Apr. 11, 2003).
 {¶ 44} 8. The term used for the procedure in which the cataract is ultrasonically broken up and then suctioned out with a thin aspirating probe is "phacoemulsification," and its advantage is that surgery can be performed through a small incision. This type of cataract surgery leaves the capsule in place and usually takes 25 to 40 minutes. E.g., General Ophthalmology, supra, at 171; Merck Manual, supra, at 724-725; www.cataractdoctorsfyi.com (downloaded Apr. 11, 2003); www.milwaukeevision.com (downloaded Apr. 11, 2003).
 {¶ 45} 9. In contrast, a corneal transplant involves the use of human tissue. Human corneas for transplant operations are harvested upon the donor's death. Because the corneal graft is tissue from another body, there is always a risk that the donated cornea will be rejected. However, by 1995, refined sutures and instruments, and sophisticated operating microscopes and illuminating systems, "significantly improved the prognosis in all patients requiring corneal transplants." Nonetheless, corneal graft rejection continued to be a major management problem as did controlling postgraft astigmatism following corneal transplants. General Ophthalmology, supra, at 143-144.
 Conclusions of Law {¶ 46} Relator, the employer herein, argues that the commission abused its discretion in awarding permanent partial disability compensation under R.C. 4123.57(B) for a total loss of vision of both eyes when all medical reports agree that, at the time the application was filed, claimant had 20/20 vision in both eyes without glasses and that his eyes were functioning well. Relator acknowledges that claimant had a temporary loss of vision. However, relator emphasizes that claimant, with surgical treatment, regained full vision. Accordingly, relator argues that the commission abused its discretion in awarding compensation for a permanent loss of all vision in both eyes. The magistrate agrees.
 {¶ 47} The commission's evidentiary basis for making the award was Dr. Kode's opinion that, prior to surgery, cataracts rendered claimant blind for all practical purposes. In its order, however, the commission did not find that there was any loss of vision existing at the time the application was filed nor any
loss of vision at the time of the evidentiary hearing. Further, the commission did not identify any evidence suggesting particular risks or problems currently associated with this claimant's eyes.
 {¶ 48} The commission also enunciated the legal basis of the award, stating that it was applying the rule set forth in Stateex rel. Kroger v. Stover (1987), 31 Ohio St.3d 229, paragraph two of the syllabus. In that decision, the Ohio Supreme Court held: "The improvement of vision resulting from a corneal transplant is a correction to vision and thus, shall not, on the current state of the medical art, be taken into consideration in determining the percentage of vision actually lost pursuant to R.C. 4123.57(C)."
 {¶ 49} In Kroger, the claimant had sustained severe burns and scarring to his corneas in an industrial injury, and he underwent a corneal transplant to the right eye in 1979. The eye had previously rejected transplants twice. The court noted that, after the successful transplant, the claimant had "some" vision with glasses, as long as there was bright light. However, the court noted that the evidence showed that, on a cloudy or rainy day, or in twilight or dawn light, the claimant could not see more than six feet even after the corneal transplant. Id. at 234, fn. 5. Further, the claimant had not attempted a transplant for the left eye. The court observed that the record included evidence that rejection of a donated cornea was possible.
 {¶ 50} The Supreme Court upheld the commission's award of permanent partial disability compensation under R.C. 4123.57(C) for total loss of vision of the left eye, which had not been surgically treated at the time of the hearing, and 80 percent loss of vision of the right eye, which had the corneal transplant. The court explicitly recognized that advances in medical technology might, at some future time, support the conclusion that a corneal transplant provided a permanent improvement of vision similar to the way in which surgery could repair a broken bone and restore use of a limb. Id. at 234.
 {¶ 51} The magistrate concludes that the holding and reasoning in Kroger are not applicable in the present action because the facts of the present action are materially different. Not only is cataract surgery significantly different from corneal transplant surgery, but, in addition, significant advances in medical technology have been made in all types of eye surgery, especially cataract surgery, since the surgery described inKroger. Moreover, the medical status of the two claimants following surgery was materially dissimilar.
 {¶ 52} First, unlike cataract surgery, corneal transplant surgery involves the use of donated human tissue, with its concomitant risk that the transplant will be rejected. Indeed, the court in Kroger noted that the claimant had experienced tissue rejection with unsuccessful transplants in the past, which made uncertain the question of whether he could successfully have a corneal transplant on the other eye. Cataract-removal surgery is a less complicated procedure than a corneal transplant.
 {¶ 53} Second, at the time of the hearing in Kroger, the claimant had undergone surgery on the right eye only. The left eye was still in the same burned and scarred condition as it was after the industrial accident. Indeed, part of the court's rationale was based on the uncertainty of any improvement being possible for the left eye. Thus, claimant uncontrovertibly had a loss of vision in the left eye at the time of the application.
 {¶ 54} Third, in Kroger, the surgery on the right eye yielded no more than partial improvement of vision. The claimant had only limited vision, with glasses, after his corneal transplant, and only when in bright light. In low light, claimant could see only a very short distance while using his glasses. InKroger, the record included evidence that claimant was severely restricted in the activities of daily life due to poor vision, even after the surgery.
 {¶ 55} In contrast, in the present action, the surgeries at issue were cataract removals involving both eyes. Further, both cataract removals were completely successful. After the surgeries, claimant had 20/20 vision without glasses. There is no evidence that claimant's daily activities are limited in any way by the allowed eye condition, unlike the situation in Kroger.
Here, neither claimant nor his surgeon gave any indication that the surgery was less than 100 percent successful, and Dr. Kode identified no specific dangers peculiar to claimant. Any risks of complications in cataract surgery were purely theoretical, and none had been realized by claimant. Moreover, the record demonstrates that, at the time claimant filed the request for compensation under R.C. 4123.57(B), all physicians agreed that he was experiencing no loss of vision due to his industrial injury, which was completely unlike the situation in Kroger.
 {¶ 56} Finally, another reason that the Kroger holding should not be applied in this action is that significant technological advances have occurred in medical technology for eye surgery, especially cataract surgery, since 1979 when the corneal transplant described in Kroger was performed. This conclusion — that major and material advances in medical technology for eye surgery, especially cataract surgery, occurred between 1979 and 2000 — is based on an extensive review of medical literature, of which the sources cited above are representative.
 {¶ 57} In 1987, when the Kroger decision was rendered, cataract surgery was not yet the relatively simple, low-risk procedure that it was by December 2000, when claimant had his first cataract removal. In 1987, cataract surgery had only recently become an outpatient procedure; at that time, medical technology did not offer the sutureless microsurgery with ultrasound methods that were used by Dr. Kode in 2000 and 2001. The medical literature indicates that, since 1987, cataract surgery has developed dramatically, and by 2000, it could provide substantial or complete restoration of vision in the majority of cases. Indeed, the evidence in the record demonstrates that this claimant had a complete restoration of vision in both eyes.
 {¶ 58} The magistrate concludes that the ruling in Kroger
cannot reasonably be applied in the present action. Not only have there been dramatic advances in medical technology — an eventuality that the court plainly envisioned in Kroger — but the facts of the present action are materially different from those in Kroger. The record indicates that a highly successful procedure was performed that restored full vision, with no evidence of any complications. Accordingly, based on the evidence presented in this case, the magistrate concludes that claimant's eyes were repaired surgically in a manner similar to the way in which a fractured leg can be successfully repaired by surgery with instrumentation, or similar to the way in which a severed finger can be successfully reattached using advanced surgical techniques. See State ex rel. Qiblawe v. Indus. Comm.,96 Ohio St.3d 347, 2002-Ohio-4759; State ex rel. Welker v. Indus. Comm.
(2001), 91 Ohio St.3d 98; see, also, Kroger, supra (indicating in regard to the corneal transplant in 1979 that technological advances could some day support the conclusion that a corneal transplant provided a permanent improvement of vision that is similar to the way that surgery can repair a broken bone).
 {¶ 59} In sum, the commission could not reasonably conclude that this claimant sustained a permanent loss of use of both eyes. The commission's reliance on Kroger and on its administrative policy derived from Kroger was misplaced. The commission's award of compensation for permanent partial disability for a total loss of use of both eyes was an abuse of discretion, based on the evidence before it.
 {¶ 60} To the extent that any problem should arise with regard to claimant's vision, including any loss of the excellent results of the cataract surgery that might occur, claimant may seek compensation under R.C. 4123.57(B) at that time. If he experiences new and changed circumstances involving a loss of vision due to his industrial injury, he may file a new application after such loss occurs. See, generally, R.C. 4123.52;State ex rel. B C Machine Co. v. Indus. Comm. (1992),65 Ohio St.3d 538.
 {¶ 61} The magistrate recommends that the court grant a writ of mandamus directing the commission to vacate its orders awarding scheduled-loss compensation under R.C. 4123.57(B) for a total loss of vision of both eyes and to issue a new order denying the requested compensation.
[1] At the time of the hearing, claimant had not yet undergone a transplant for the left eye although he anticipated doing so in the future.
[2] R.C. 4123.57(B) states, in relevant part, "[f]or the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks * * * based upon the percentage of vision actually lost as a result of the injury * * *. `Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease."